Carlos **MORALES FELICIANO,** et al, Plaintiffs,

v.

Sila María **CALDERON SERRA,** et als, Defendants.

No. CIV. 79–004(PG).

United States District Court, D. Puerto Rico.

Jan. 26, 2004.

**322**

Manuel A. Rodriguez–Banchs, Carlos V. Garcia–Gutierrez, Jose R. Roque–Velazquez, Civil Action and Education Corporation, San Juan, PR, for Carlos Morales–Feliciano.

Ricardo Alfonso–Garcia, Rafael E. Rodriguez–Rivera, Civil Action and Education Corporation, San Juan, PR, Lillian N. Miranda–Rodriguez, Cond. La Arboleda, Guaynabo, PR, for plaintiffs.

Marcos A. Ramirez–Lavandero, Ramirez Lavandero & Associates, Rio Piedras, PR, for Rafael Hernandez–Colon.

Eileen Landron–Guardiola, Eduardo A. Vera-Ramirez, Landron & Vera-Ramirez, Landron & Vera LLP, Guaynabo, PR, for Johnny Rullan.

Esther Crespin–Credi, Dept. of Justice, Federal Litigation Div., San Juan, PR, for Mirla M. Rodriguez–Marin.

**OPINION AND ORDER**

PEREZ–GIMENEZ, District Judge.

On October 1, 2003, Defendant Hon. John Rullán, MD, Secretary of the Department of Health of the Commonwealth of Puerto Rico filed a *Motion Under the PLRA to Vacate or Terminate the Court Relief Mandating the Transfer and Privatization of the Correctional Health Program of the Department of Health* (Dkt.# 8486) (hereinafter Defendant's Motion).[1] On October 23d the Plaintiff Class opposed and filed a cross motion (Dkt.8500) to modify the Medical and Mental Health Plans by terminating two sections of those Plans (Dkt.# 1959), and a handful of ancillary orders. A hearing was set for November 4, 2003.

Over the course of several hearings Defendant presented the testimony of Dr. Héctor José Mena Franco, MD, Executive

---

1. Although the unsigned certificate of service indicated that a copy of the PLRA Motion was served on Plaintiffs' counsel on that same date, it was not delivered to Plaintiffs' until October 8, 2003, after a telephone request by Plaintiffs' counsel. The allegedly mailed copy was never received.

Director of the Correctional Health Program, Dr. Aida Guzmán Font, MD, who headed the Correctional Health Program from April of 1993 through March 2000 and from February 2001 through March 2003 as Chief Health Care Coordinator, Dr. Robert Dennis Jones, MD, who testified as an expert in medical, mental and dental correctional health and administration[2], and the Hon. Miguel Angel Pereira Castillo, Secretary of the Department of Corrections and Rehabilitation and acting Administrator of the Administration of Corrections. In addition, extensive documentary evidence was admitted into evidence. After the presentation of this evidence Defendant rested on the issues of alleged compliance with the Medical and Mental Health Plans and the supposed lack of current and ongoing constitutional violations.

The order at issue is part of a stipulation or consent decree entered into by the parties in September 1997 as a joint alternative proposal for a remedy to substandard and chaotic conditions or denial of health care throughout the Administration of Corrections, all of which is detailed in the court's Opinion and Order, *Morales Feliciano v. Rossello Gonzalez*, 13 F.Supp.2d 151 (D.P.R.1998). The court approved and ordered the consent decree executed, without passing on the court's own expert witness' recommendation for a receivership. One important component of the joint proposal was defendants' responsibility to set up a private not-for-profit corporation (the initial organizational communication and operational expenses to be paid for out of fine funds held by the court) which would eventually contract with the Administration of Correction to provide health care to persons in custody of the Administration of

Corrections. Extensive testimony and charts were presented during the process in 1997 to be followed until the not-for-profit corporation (eventually registered as the Correctional Health Services Corporation or CHSC) could compete with other providers in Puerto Rico's newly privatized indigents' health care economy in contracting with the AOC.

The Secretary's contention in requesting termination is threefold; that the Correctional Health Services Program is performing efficiently its task of delivering health care to persons in the custody of the AOC, that the CHP is complying with the Medical and Mental Health Plans and, that prisoners' federally protected rights are no longer violated. The Secretary, on his own evidence, is wrong.

## FINDINGS OF FACT

The defendant has established that by contracting with private individuals and companies he has greatly enriched the professional staffing his command. He has also established through his own witnesses that fully one fourth of inmates who request sick-call do not get it; only 55% of ambulatory care appointments in fact occur, and only 49% of extra-mural appointments are met (these are specialist consultations for serious conditions, surgery etc.). The quoted percentages are a few points below the 1996–1997 averages, and in the case of outside specialist or hospital appointments the drop is significant, from 61.8% completion in 1996–1997 to 49% at present. All of this is enough to find that there is still a present and ongoing systematic and massive denial of health care to the inmate population in the care of the Correctional Health Program.

---

**2.** After his cross-examination plaintiffs moved to strike Dr. Jones' opinion testimony. The court declines to do so. Dr. Jones formally meets the criteria for delivering expert testi-

mony. After his cross-examination, however, the court gives very little credence to those opinions.

In 1998 the court found that "[t]he deficiencies evidenced at the hearing are the result of systematic infirmities in the correctional health scheme, which can be characterized as (a) obstructionist interference from and inefficiency within the Department of Health and other government agencies and (b) the lack of cooperation on the part of the Administration of Correction." *Morales Feliciano*, 13 F.Supp.2d at 179–180. Since the Secretary has increased expenditures on professionals and private service companies [3] and inmates still fail to get health care in very substantial numbers (at eroding rates, in fact), the only finding that the court can make is that the Correctional Health Program and the Department of Health continue to fail in the administration of increased resources and continue to violate prisoners federally protected constitutional rights. The court cannot but underline that denial of health services is massive and systematic.

No matter how much the Correctional Health Program blames the Administration of Corrections for the Program's failure, the court cannot accept the present and ongoing mistreatment of plaintiffs because two cabinet secretaries—Health and Corrections—cannot get together to solve custody and transportation issues. Theirs has been and still is a joint responsibility [4] until we all deal with the consequences of Plaintiffs' motion to terminate which we discuss further on. Since 1993 Dr. Aida Guzmán, M.D. has been involved with correctional health care. During the present hearings she had this to say about inter-agency cooperation and the failure to deliver health care:

> Because the problems are the same as in 1997, same problems, problems with access.
>
> .    .    .    .    .
>
> It is the same problems, because there has been no actual change in terms of the attitude of the organization of the Administration of Correction in providing access to care; that has not changed.

Tr. at 909:4–13.

The delays in affording inmates with important extra-institutional appointments and medical care paint a grimmer picture than that of 1997. The situation is particularly critical in the Ponce Correctional Complex, Ex. 18, where a significant percentage (just over 20%) of the total inmate population live, including almost 40% of the women under the custody of the AOC. Tr. at 1158:4–7. The Master List of Medical Routes for the Ponce Complex, copy of which was marked as plaintiffs' Exhibit 18, is plagued with instances of patients that missed important medical appointments and procedures due to lack of transportation. For example, between September 23 and September 30, 2003, all of the Ponce inmates that were scheduled for extra-institutional medical appointments—a total of 72—missed them. Ex.18. Among the appointments missed during that week were 12 mammograms, 6 abdominal/pelvic sonograms, 4 brain CT scans, 2 MRI's, and various orthopedic and oncological evaluations that are described as "important" in

---

**3.** Some of these contracts do not provide full services: the CHP has a long standing contract with Clendo Laboratories to perform laboratory services: pick-up and delivery happen once a day. ("Panic" results are transmitted to the CHP by fax when the tests show results which need immediate attention.) The CHP, however, has no capacity at all to do STAT testing. Tr. At 554:18–20. STAT test results are necessary when a patient is in critical conditions that require an immediate response. Tr. At 1160:23–1161:5.

**4.** Moreover, under Puerto Rico law physicians are required to make certain that their medical orders are carried out. Tr. At 900:24–901:8, 902:7–9.

the log. *Id.* On October 15 and 16, 2003, all of the 23 appointments scheduled for those 2 days were also missed. *Id.* The same was true with the 14 appointments scheduled for October 9, 2003, the 12 for October 7, 2003, and the 18 for October 2, 2003, to name just a few. *Id.* One of the appointments missed on October 2, 2003 was a surgical intervention that the inmate Luis Martínez Cruz was supposed to have that day. *Id.* The female Ponce inmates have been left without gynecological medical attention since the end of September 2003, Tr. at 1154:20–1155:2, and are experiencing and have experienced delays of over 6 months to have mammograms performed. Tr. at 524:1–5. Although Exhibit 17 established that such had been the case of inmate Marta López Huertas, hers was not an isolated incident as evinced by Exhibit 18.

As a matter of fact, the last time that a female inmate from Ponce was taken to her scheduled mammogram was on May, 6, 2003. Since then, all of the mammogram appointments have been missed for lack of transportation. Exhibit 18. Inmate Conilia Betancourt Fernández has been waiting to have a mammogram since April 22, 2003, Ruth Rodríguez Santiago since May 1, 2003, and María Cameron Alers since May 15, 2003. From then on, Conilia Betancourt Fernández has not been taken to 6 mammogram appointments (June 3, June 19, July 15, August 28, September 30, and October 28, 2003), Ruth Rodríguez Santiago, to 4 (June 12, June 19, September 4, and October 2, 2003), and María Cameron Alers, to 6 (June 3, June 19, July 15, August 28, September 25, and October 30, 2003). During that same time span, various other female inmates were not transported to their scheduled mammograms on more than one occasion, to wit: Leonilda Santiago Santiago was forced to miss her appointments for August 26, September 25 and October 30, 2003, Norma Rosa Rivera and Betsy Rodríguez Vargas missed their respective appointments for August 28, September 30 and October 28, 2003, Rosa Robles Galarza missed hers for September 18 and October 21, 2003, while Ana Peña Frías had to endure the same outcome on September 23 and October 23, 2003. Ex. 18.

Such extended delays in obtaining medically ordered medical tests is simply unacceptable under any set of standards. Tr. at 1178:25–1179:12. A delay of eleven (11) months for a CT scan is equally untenable. *Id.* Such was the case of inmate José Velázquez Rivera, from Ponce Maximum. Ex. 19. The systemic infirmities caused by the AOC's lack of cooperation with the CHP persist at present. As Dr. Guzmán opined:

> I think that the Administration of Corrections has been consistently and historically unresponsive to the needs of the [correctional health] program and above all to the needs of the patients.

Tr. at 905:18–21.

Despite claims to have done everything possible to ensure inmate's access to appointments, Tr. at 902:17–23, the CHP has exacerbated this problem by inflexibly centralizing its services in a system which has historically suffered from problems with access to medical appointments. Tr. at 902:17–23, 1161:20–24, 1163:4–21. No example of this is more illustrative than the situation which has arisen in Bayamón 501, an institution which houses protective custody inmates, who are at risk of being attacked when placed in the general population. Since that institution's medical area was shut down, injectables can only be given at a neighboring general population institution, Bayamón 1072. Tr. at 583:3–14. This means that insulin dependent patients from Bayamón 501 have to be taken up to twice a day to Bayamón 1072 to receive their shots. Tr. at 578:15–18, 579:5–16. These protective custody in-

mates sometimes spend the entire day in Bayamón 1072's medical area, which has very poor security, with general population inmates. Tr. at 578:23–25; 579:2–4, 580:7–15, 581:12–25. This same procedure applies to other protective custody inmates from Bayamón 501 who require injections. Tr. at 581:12–25, 583:3–14.

No good reason was given at the hearings by defendant for having to transport these inmates to Bayamón 1072, instead of coordinating a system for providing insulin shots at Bayamón 501. Tr. at 717:6–719:18, 722:10–14, 727:6–14. This problem, seemingly a simple one to solve through mutual cooperation between AOC and CHP, eventually lead to litigation in the Puerto Rico Superior Court which resulted in an injunction being issued against the CHP requiring it to provide insulin shots in the protective custody institution. Tr. at 724; 728:10. Nevertheless, for reasons which are totally incomprehensible, this service is being provided only to the patient who requested the injunction, and the remaining insulin dependent patients are still required to move to another facility on a daily basis to receive their shots. Tr. at 728:3–16. This absurd result is a perfect example of the Department of Health's and Administration of Corrections' senseless inability to work with each other to achieve common goals. This problem is not occurring only because the AOC is not doing its part, but because there is a fundamental failure between both parties to cooperate.

The high level of tension and the utter failure of the AOC and the CHP to coordinate, communicate, and cooperate is also evident in the fortune of the medical cadre. Developed for the purpose of ensuring security in medical areas and that medical escorts would be available to transport inmates to their medical appointments, Tr. at 770:24–771:2, this remedy has not had the expected results, again, because of the lack of cooperation between AOC and CHP, Tr. at 780:13–781:4, 782:10–16, 902:22–903:9.

Another system-wide problem which persists and downgrades the value or limits the availability of the health care provided are the inadequate physical facilities. In this regard, Dr. Guzmán's testimony was also particularly telling when she characterized the facilities as "shameful for our patients and for our health professionals." Tr. at 904:12–13. Dr. Guzmán explained the reasons for the progressive deterioration of the physical plant, when compared to the 1997 conditions, as follows:

> [T]here has been no success in trying to get the collaboration of the Administration of Correction in accessing patients to our services and in the physical facilities. It is the same. In fact they are worse facilities, because around seven years have passed by, in terms of the deterioration of the physical facilities, so they are worse.

Tr. at 909:23–910:4.

There has also been longstanding chronic neglect of the physical facilities for medical area services. Tr. at 761:11–13. The facilities available are small and deteriorated. Tr. at 498:6–7. The lack of appropriate facilities clearly affects the CHP's ability to deliver health services. Tr. at 497:25–498:2.

Infirmary beds are often full and obligate the CHP to keep patients in the emergency room. Tr. at 788:9–13. There is a long waiting list for medical dormitory beds because there are not enough beds to take care of the patients with chronic conditions for whom such housing is necessary. Tr. at 788:16–20. Areas designated for medical dormitories were taken over years ago (in fact, before the Court's 1998 findings) by the AOC for other uses (housing for inmates) and were never returned

to CHP for use as medical dormitories. Tr. at 788:20–789:2. There are no isolation rooms for the management of patients with active tuberculosis. 989:23–990:24.

There are now less Psychiatric Intensive Care Unit (PICU) beds for patients who need acute mental health care services than there were in 1997, twenty, while there has been an increase in the inmate population. Paragraph 8 of the Mental Health Plan requires 2 PICU beds per 1,000 inmates. In 1997, the court found that 25 such beds were required, which left a shortage of 5. At present 30 PICU beds would be required, while there are only 18 PICU beds, Tr. at 811:15–812:4, two of which no longer really function as a PICU. Tr. at 820:18–24. Hence the shortage of PICU beds has now more than doubled when compared to 1997.

The CHP expects to acquire 13 additional beds, but the current waiting list is of 70 patients. Tr. at 598:16–18. Generally throughout the system there are 1,311 inmates, equivalent to 8.7% of the total population, that are being housed in areas that do not provide them with the level of care that their chronic medical or mental conditions require, Tr. at 1260:2–6, all in violation of paragraphs 28 and 29 of the Medical Plan. Ultimately what this means is that persons having medical conditions which require a certain level of constant oversight and attention will simply have to go without.

The CHP again attempts to place the onus of this problem on the AOC. However, although the interagency agreement between AOC and the Department of Health states that the AOC shall provide necessary space for medical services, 708:17–24, the fact is that the Medical Care Plan places responsibility upon the Health Department as well as the AOC for the provision of adequate medical facilities. Tr. at 735:3–14. In fact, the Department of Health through the CHP has and main-

tains the correctional psychiatric hospital for the exclusive benefit of the inmates under the custody of the AOC. Even though under the circumstances it may not be reasonable to expect the CHP to build all the facilities it needs, they certainly have not reached out to the Court to request its assistance with this problem, and, from the evidence presented there is no suggestion that they have endeavored to do much more than write a few strongly worded letters and attend a handful of meetings. Tr. at 536:10–25–537:3–20.

Although, the medical doctors at CHP prescribe medical diets, Tr. at 599:11–18, medical diets are *still* not being provided to inmates, 1087:1–5, 1088:3–4, 1088:15–17, slowly but surely endangering the health and well being, and in some cases the lives of those patients who require them. *Morales Feliciano v. Rossello*, 13 F.Supp.2d 151, 197 (D.P.R.1998) Among those who require special diets are insulin dependent diabetics, non-insulin diabetics, patients with renal and hepatic conditions and heart disease. Tr. at 600:1–17. In the April, May and June quarter of 2003, 3,120 diets were prescribed and not provided. Tr. at 609:15–18. Although food service is administered by the Administration of Corrections, there is no evidence that the CHP does anything whatsoever to remedy the longstanding problem of medical diets.

Defendant makes much ado of improvements to the system relating to the CHP's fiscal and administrative autonomy. Tr. at 1305:1–10. In fact, over the past few years since the Court's May 1998 Order, the improvements in the CHP that can be observed are due entirely to the Court's direct intervention. The fiscal and administrative autonomy as well as the power to contract directly with professionals and service providers were rooted in orders issued by this Court:

Q. Doctor, based on your years of experience in the program, what has happened that has assisted the program in achieving, progressing, staffing, supplies, etcetera.

[Dr. Aida Guzmán] I think that if you look at this longitudinally, one of the big problems that the program faced in 1997 was the lack of administrative autonomy, everything had to go through a facility, which was the operational branch of the Department of Health. The administrative offices of the program at that time, in 1997 were just offices where documents went by, went through and there was no decision making at the program level. I think that a number of things happened that allowed the program to obtain the administrative autonomy that it needed so that it could recruit, retain, buy, and so forth and so on, all the administrative functions and it started with the Court order in 1997 authorizing the chief health care coordinator to process and sign all contracts and had the responsibility of hiring professional services under contract. That started it. There were a number of administrative orders from the Secretary of Health, I believe there were two of them, that partially, during late 1997 and 1998, partially gave some functions to the program in terms of administrative autonomy, but actually they were not really enforced. In 1999 when the AFASS, which again was the operational branch of the Department of Health, closed down, a few months before the closing down of the AFASS agency the program received an administrative order from the Secretary of Health, 141 which really gave autonomy to the program. It gave the authority to appoint temporary positions, it gave autonomy to contract hospital and services in the community, it also gave the authority to prepare and negotiate and present some budgets to the office of management and budget. It allowed the program to establish and develop the auction board which was very important in terms of obtaining equipment, materials, medications, etcetera, because the program up until then depended entirely on a facility, so that it gave the program the autonomy that it really needed to enhance the recruitment of very much needed professional personnel. And I think that that really helped.

Tr. at 887:17–889:10; *see also* Tr. at 672:1–21, 674:16–19, 676:11–13, 676:17–677:4. In fact, the administrative order Dr. Guzmán refers to states that it is issued, in part, under authority of the Orders of the *Morales Feliciano* case. Dr. Mena, the present Executive Director of the CHP, continues to benefit from those court orders even though he is not, in point of fact, covered by them. Tr. at 678:1–17. In addition, the infectious disease control program began to function properly when the Court allocated fine monies to the purchase of computer equipment and software necessary for the program's day to day work. Tr. at 848:19–851.

Despite these improvements, the Department of Health has been unable to comply, substantially or otherwise, with constitutional norms and with the Medical and Mental Health Care Plans. The CHP still suffers from a whole string of problems that adversely affect inmates' health care.

Having written manuals and guidelines is necessary in order to maintain accountability in the provision of health services. Tr. at 1187:20–1188:3. Nevertheless, only 1 of 8 treatment protocols for mental conditions has been prepared for a meager 12.5% compliance rate with paragraph 9 of the Medical Plan, which requires "written protocols for the delivery of medical, dental and mental health services." Tr. at 1262:23–1263:13. The suicide protocol

(prevention manual) is still wanting while suicides have substantially increased from 1 in 2002 to 7 during the first 9 months of 2003. Tr. at 1075:25–1076:5, 1189:13–21, 1077:20–22.

There are currently 1085 inmates with an HIV diagnosis; yet there are only 340, or 31.3%, undergoing treatment for that condition. Tr. at 1263:24–1264:7. Likewise, there is no protocol currently in place for the management of HIV patients. Tr. at 531:16–8. Hepatitis C Virus ("HCV") has reached epidemic proportions by infecting 4,828 inmates or close to a third of the total population. Tr. at 1165:20–1166:4. Yet, there were only 117 inmates undergoing treatment for that condition during the last quarter of fiscal year 2002–03. Tr. at 659:6–10.

Dr. Mena attempted to explain the abysmal disproportion between those numbers by testifying that 73.4% of the infected inmates did not meet the established treatment criteria. Tr. at 660:1–6. However, Dr. Jones clarified during his cross-examination that that figure did not mean that those inmates would never meet the criteria. Tr. at 1170:4–8.

A pilot study conducted in the West Detention Center during the last quarter of 2001–2002 found that almost a quarter (23%) of all HCV inmates did not meet the treatment criteria although they did have elevated liver enzymes twice in a period less than 6 months. Based on those findings and in light of the disease's progression, Dr. Jones opined that he would expect a high number of those inmates to have elevated liver enzymes when tested after the 6 months threshold period, thus becoming eligible for treatment. Tr. at 1175:14–1176:3. Dr. Jones further opined that those patients would have to be followed-up closely and that treatment should be initiated immediately after they met the criteria. Tr. at 1176:6–14. Although Dr. Jones testified that he understood that the required, close follow-up was being provided, he could not offer a satisfactory explanation of why the most current data at the CHP concerning the HCV epidemic was more than six-months-old, dating back to April of 2003. Tr. at 1172:7–1174:7. Meanwhile, deaths caused by HCV increased fourfold in 2002, jumping to 12 from the 3 deaths that occurred in both 2000 and 2001. Exhibit 14. The number of deaths caused by HCV as of September 30, 2003 has already doubled each of the totals for 2000 and 2001. *Id.*

While inmate mortality rates are on the rise, the CHP is not addressing that phenomenon with the sense of urgency that the situation requires. Inmate deaths upsurged in 2002 to 73 from 50 in 2001 and 47 in 2000. Exhibit 14. That is roughly a 25% increase over the two preceding years. Tr. at 1059:21–1060:8. Inmate deaths as of September 30, 2003 have already surpassed the total deaths that occurred in each of 2000 and 2001.[5]

Under Puerto Rico Law, the Institute of Forensic Medicine is obliged to conduct an autopsy in each of the following set of circumstances:

(4) When the death occurs while in custody of the Police or officers of law and order; while in prison, or as a result of

---

5. The accuracy of the 2003 death statistics came into question during the cross-examinations of doctors Mena and Jones. While the Mortality Report, a copy of which was admitted into evidence as plaintiffs' Exhibit 14, recorded 51 deaths until September 30, 2003, plaintiffs presented 62 death summaries for that same period, which were marked as Exhibit 16. While Dr. Mena was not able to explain the discrepancy in the numbers, Dr. Jones ventured to say that the Mortality Report only recorded deaths with a known cause. Tr. at 1122:20–1123:2, 1126:6–19; 1127:6–8.

sickness or injury occurring while in prison, or suspicion thereof.

. . . . .

(6) When it is due to acute intoxication with alcohol, narcotics, or any other type of drug or controlled substances or suspicion of such.

(7) When it is due to suicide or suspicion of such.

34 LPRA § 3011. Even though Puerto Rico law requires autopsies under these circumstances, autopsies are not routinely practiced upon persons who die while incarcerated and it appears that the CHP does nothing to compel the Forensic Science Institute to observe this requirement. Tr. at 1111:10–12, 1071:20–1072:13, 1073:14–20, 1105:14–1106:13. No doubt this hinders the CHP's ability to fully review the medical circumstances surrounding deaths which occur within the system. Although Dr. Jones generally opined that the CHP was properly monitoring, investigating and addressing the increased inmate mortality rate, he was forced to admit that the Annual Report of the Central Level Quality Assurance Committee for fiscal year 2002–03 did not discuss or mention the topic as it should have had. Tr. at 1129:6–1130:8. He further admitted that he did not verify whether appropriate mortality review documents are compiled by the CHP. Tr. at 1125:6–14, 1127:15–1128:4.

Pursuant to paragraph 70 of the Medical Health Plan, one of the matters that the Quality Assurance Committee must evaluate and monitor is precisely inmate mortalities. ("At a minimum, the Quality Assurance Committee shall review inmate mortalities . . .") Although the latter have been increasing since 2002, the Defendant did not present a shred of evidence that would permit the Court to infer that the situation is being adequately addressed. Quite to the contrary, the Quality Assurance Committee, which is supposed to hold *quarterly* meetings, did not meet during

the April, May and June quarter of 2003. Tr. at 516:13–25. In fact, there was a dramatic increase in withdrawal deaths in 2002, jumping from a stable trend of 1 or 2 per year to 9 in 2002 and 6 during the first nine months of 2003. Tr. at 1060:16–22, 1068:19–25, 1069:3–11. Even though Defendant's expert, based on his interviews with clinicians, concluded that the rise in these deaths is due to a new designer drug, Fentanyl, Tr. at 1063:10–17, 1066:9–14, 1068:14–17, from his own testimony it appears that the CHP has taken no precautions to alert medical personnel throughout the system of this increased risk. Tr. at 1187:10–19. And the failure to do death review properly increases the probability of never finding out whether the hypothetical Fentanyl or other designer or vulgar drugs are causing the deaths.

Wellness clinics, yet another requirement of the Medical Plan, are not performed at satisfactory levels as admitted by Dr. Mena. During fiscal year 2002–03 the overall compliance rate fluctuated from 29% in the first quarter, to 36% in the second quarter, 29% in the third quarter and 14% in the last quarter of the year. Tr. at 644.

The CHP continues to have serious problems with retrieving medical records, especially in cases of readmissions. During fiscal year 2002–03, there were 3,997 inmates re-admitted to the AOC system. CHP retrieved the records for only 1,315 of them. This means that the medical records of 2,682 re-admitted inmates were not found. That is, CHP was able to retrieve the medical records for only 29.2% of the re-admitted inmate population during the fiscal year ended on June 30, 2003. Tr. at 1265:15–1268:10. Once again the Secretary has had recourse to the private sector to alleviate the missing-records problem and hired Iron Mountain, Inc. to organize records.

The CHP is still suffering from a shortage of psychiatrists. Tr. at 836:4–10. This is particularly critical at Guerrero, which is not only an intake center but has a psychosocial unit. Tr. at 121:2–14, 240:13–17, 432:20–25, 613:20–614:5, 705:23–24. Guerrero has been without the services of a psychiatrist for several months. Tr. at 614:1–5. In fact, although staffing is much better than it once was, there continue to be generally some important gaps in terms of required professional medical staff. Tr. at 524:1–5, 525:15–19, 613:17–24, 614:1–5, 836:4–10, 885:21–886:7, 1090:10–16, 1156:19–24.

In 1997, psychiatric and mental health services reached only 25% of the inmates in need of them. In 2003, the situation has improved, since, according to Dr. Guzmán's most recent estimates, the CHP is reaching 60% of the inmates in need of psychiatric and mental health care. Tr. at 842:14–18. However, the current level is still far short of the 95% targeted rate. *Morales Feliciano,* 13 F.Supp.2d, at 179.

The critical nature of the problems still confronted by inmates whose health is seriously jeopardized because of the way medical services are administered by the CHP and the AOC is attested to by the significant number of grievances filed by them pursuant to the administrative remedies procedure of the CHP. Tr. at 1178:7–10, Ex. 19. And the CHP directs complainants to file a grievance with the Administration of Corrections.

### THE REMEDY

Under the Prison Litigation Reform Act ("PLRA"), "Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

What must be first considered and borne in mind in dealing with health care in this case is that the Administration of Corrections runs a "mixed" jail/prison incarceration system with prisoners locked up in forty (40) institutions dispersed throughout the length and breadth of Puerto Rico: some are grouped in "complexes" of five or six institutions near important urban centers (Río Piedras, Bayamón, Ponce) and some are isolated and near nothing much by way of hospital and specialist availability. There are five admission, intake facilities at Río Piedras, Bayamón, Vega Alta, Ponce and Guerrero. The second consideration that must be taken into account is the longstanding, documented time and again history of noncompliance with Court orders.[6] Compliance and care are in direct inverse proportion to the seriousness of these constitutionally deep-rooted rights of the plaintiff class. The frequency of transfers added up to those factors make it necessary for the Court to fashion and grant system-wide relief.

The Prison Litigation Reform Act of 1995, dismembered and codified in various titles of the United States Code, sets a Sphinx's question for courts and litigants who must seek and order relief for violations of jail and prison inmates' constitutional rights: § 3626 of Title 18, at various places requires the parties not to request, and orders that the courts of the United States "shall not grant or approve any prospective relief unless the court finds

---

6. The Court has set out this history in detail, *Carlos Morales Feliciano v. Rossello Gonzalez,* 13 F.Supp.2d 151, 156–159 (D.P.R.1998).

that such relief is [simultaneously] narrowly drawn, extends no further than necessary to correct the violation of the Federal right and is the least intrusive means necessary to correct the violation of the federal right." Additionally, "the court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." § 3626(a) and (b) *passim.* This language mimics long standing requirements for injunctive relief under Rule 65 of the Federal Rules of Civil Procedure. Referred to in the cases as the "need-narrowness-intrusiveness findings" this is the old "over broadness" doctrine used to measure garden variety injunctive relief under Rule 65.

A decade before the PLRA was enacted, Federal courts had well settled doctrines and standards on the issuance of equitable relief. It is well worth quoting *in extenso* from *Toussaint v. McCarthy,* 801 F.2d 1080, 1086–1087 (9th Cir.1986) which discusses pre-PLRA standards and doctrines in relation to constitutional violations by state actors in contextualized language:

We agree with the Fifth Circuit's description of the role of the federal courts. Injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation. *See Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (remedy must be related to condition alleged to offend the constitution); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (task is to correct, by a balancing of the interests, the condition that offends the constitution; judicial powers may be exercised only on the basis of a constitutional violation); *Hoptowit v. Spellman,* 753 F.2d 779, 785 (9th Cir.1985) (judge must order correction of specific violations and may require only that these corrections bring the conditions above

constitutional minima); *Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir. 1982) (relief must be no broader than necessary to remedy the constitutional violation), cert. denied, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983); *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.1982) (function of court is limited to determining whether a constitutional violation has occurred and to fashioning a remedy that does no more and no less than correct that particular constitutional violation); *Ruiz v. Estelle,* 679 F.2d at 1144–46 (court must fashion the least intrusive remedy that will still be effective). "The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States." *Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

*In fashioning a remedy for constitutional violations, a federal court must order effective relief. Smith v. Sullivan,* 611 F.2d 1039, 1044 (5th Cir.1980). *Therefore, a federal court may order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation. See North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 28 L.Ed.2d 554. *A defendant's history of noncompliance with prior court orders is a relevant factor in determining the necessary scope of an effective remedy. Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Hoptowit v. Ray,* 682 F.2d at 1247; *Ruiz v. Estelle,* 679 F.2d at 1155–56. [Emphasis added.]

However, our goal is to cure only constitutional violations. *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. at 16, 91 S.Ct. 1267; *Wright v. Rushen,* 642 F.2d 1129, 1133–34 (9th

Cir.1981). The commission of a federal judge is not a "general assignment to go about doing good." *Jett v. Castaneda,* 578 F.2d 842, 845 (9th Cir.1978). Accordingly, injunctive restraints that exceed constitutional minima must be narrowly tailored to prevent repetition of proved constitutional violations, and must not intrude unnecessarily on state functions. *Ruiz v. Estelle,* 679 F.2d at 1156. *See* generally *Mishkin,* Federal Courts as State Reformers, 35 Wash. & Lee L.Rev. 949 (1978).

The Ninth Circuit is blunter:

Although the PLRA significantly affects the type of prospective injunctive relief that may be awarded, it has not substantially changed the threshold findings and standards required to justify an injunction. To this extent we agree with the Sixth Circuit [sic] that "the (PLRA) merely codifies existing law and does not change the standards for determining whether to grant an injunction." *Smith v. Ark. Dept. of Correction,* 103 F.3d 637, 647 (8th Cir.1996).

*Gomez v. Vernon,* 255 F.3d 1118, 1130 (9th Cir.2001).

Finding the "need—narrowness—intrusiveness" equation in a given case seems a gamble in the absence of contextuality and lends itself to gross linguistic, two-level manipulation. The Second Circuit provides an example in *Benjamin v. Fraser,* 343 F.3d 35, 53–54 (2d Cir.2003):

The City also contests as overly broad and burdensome the court's requirement that all windows designed to be opened must be operational. Contending that under the PLRA the district court was obliged to consider the utility of each window individually, the City observes:

The effect of a window defect depends upon the nature and degree of the defect, and the nature of the housing area, as well as the outside temperature. For example, a single window in a dayroom or modular unit that is stuck open a crack in mild weather, or one window that will not open among many windows that are operational in a particular area, will not cause unconstitutional conditions in that area. (Def. Br. at 48).

But it is ironic that the City, which strenuously opposes the OCC's continued participation, invokes the PLRA, which was intended in part to prevent judicial micro-management, in support of the proposition that the district court was required to examine every window. We agree with the district court that a comprehensive repair program would be more effective and less intrusive than an individual review of each window at the various facilities.

Although the PLRA's requirement that relief be "narrowly drawn" and "necessary" to correct the violation might at first glance seem to equate permissible remedies with constitutional minimums, a remedy may require more than the bare minimum the Constitution would permit and yet still be necessary and narrowly drawn to correct the violation. Given the impracticability of the court examining each window, ordering comprehensive repairs was a necessary and narrowly drawn means of effectuating relief-even though the Constitution would certainly permit a broken window or two.

*See also Jones Él v. Berge,* 164 F.Supp.2d 1096, 1096–1116 (W.D.Wis.2001), citing *Smith v. Arkansas Dept. of Correction,* 103 F.3d 637, 647 (8th Cir.1996) (preliminary injunction standard not changed.)

In this case three quite different remedies to the long-standing, current and ongoing violations of plaintiffs' health care constitutional rights have been presented. The defendants propose themselves, in the face of historical, systematic failure and current and ongoing massive violations: hope that peripheral improvements contin-

ue and maybe, sometime in the future, plaintiffs will actually receive health care. The defendants' own evidence established that as of today a quarter of those who request sick calls do not get them, and half of those who must travel to extrainstitutional appointments, which are ordered in serious cases of medical need, do not make it to the appointment. Half of prisoners who must be moved *intrainstitutionally* do not make their appointments and the CHP does not reach 40% of prisoners in need of mental health care. In spite of higher levels of budgeting and staffing the defendants still cannot provide care to their charges. The most daunting of the reasons, the principal reason offered by the defendants' evidence is the utter inability of the Correctional Health Program, which depends on the Department of Health, to coordinate with the Administration of Corrections for custody and transportation. This particular institutional failure exists ever since the Department of Health took over by court order and interagency agreement the responsibility for the delivery of health care to persons under the custody of the Administration of Corrections. Under Commonwealth law the Administration of Corrections is charged with the responsibility for prisoners' health care. 4 LPRA § 1112(f).[7]

In 1997 the Court commissioned an expert witness, Vincent M. Nathan, Esq. to prepare reports on compliance with the then extant remedial orders and to submit the health care report first of all. The expert witness complied and proposed that correctional health care be placed in a receivership because the Correctional Health Program could not deliver. The plaintiffs opposed the creation of a receivership and proposed the creation of a private not-for-profit corporation as an alternative remedy. The defendants opposed both the receivership and the not-for-profit corporation in their historical denial of reality. After two weeks of hearings an agreement between the parties was reached and a joint request was presented to the Court to allow the development and to fund the organization of a nonprofit corporation. *Morales Feliciano v. Rossello Gonzalez*, 13 F.Supp.2d 151 (D.P.R. 1998).

The Court granted in 1998 a necessary remedy and among the three alternatives chose the creation of a nonprofit corporation proposed jointly by the parties as the least intrusive and most narrowly drawn. The very fact that the defendants chose to join the plaintiffs in selecting this remedy would seem to mean—and must be taken to mean—that they understood it to be precisely tailored to the needs of the occasion, that it is narrowly drawn and least intrusive—in fact not intrusive at all.[8]

7. The only competence, in correctional health under the laws of the Commonwealth assigned to the Secretary of Health is stated at 4 LPRA § 1112(1) which refers to procedures under the Security Measures of Puerto Rico's Penal Code, arts. 66 et seq. 33 LPRA §§ 3351 et seq. which are not in use. The only explanation for the Secretary of Health to be involved in this matter at all is that the parties agreed to bring the Secretary of Health and the Secretary of Anti–Addiction Services together with the Administrator of Corrections in one section of the Correctional Health Plan (Amended Sixty–Second Report of the Court Monitor) (Docket # 1959) and

order adopting the stipulated plan (Docket # 2465). The plaintiff class has moved to terminate that section of the medical plan and the defendants have joined them.

8. There must be no doubt that this court's order of May 15, 1998 approved the joint proposal for the creation of a not-for-profit corporation as part of the remedy to the violations of plaintiffs' constitutional rights to health care. The order ended by requiring counsel for the parties to report on progress, *Morales Feliciano*, 13 F.Supp.2d at 214, which led to any number of meetings and to substantial financial support for the develop-

It is not happenstance that so many of the violations shown by the defendants' proof at the present hearings have to do with delays in transportation to outside appointments. The CHP is over-dependent on the use of the Puerto Rico Medical Center for hospital and specialist services. This was to be expected. The CHP depended in 1997, as it depends now, on outside hospital facilities and specialist services: for decades indigents and then prisoners had depended on the services rendered by the Department of Health through AFASS (Administration for Health Facilities and Services). In 1993 the structures and economy of hospital and health services began to change, and dramatically so.

With the approval of the Puerto Rico Health Insurance Act in September 1993, 24 LPRA 7000 et seq. the dependence on the Department of Health for uninsured indigents began to crumble away and as the Health Reform progressed throughout the decade it became obvious that it was best to place prison inmates in the hands of the Administration of Corrections and a not-for-profit corporation than to leave them stranded as the sole charges of a Department of Health denuded of health care capabilities: this became critical when AFASS was dissolved and public, especially regional, hospitals were sold.

The Legislative Intent of the Puerto Rico Health Insurance Act, 24 LPRA § 7001 of 1993 has an eerie resemblance to the reform history of this case, in part it reads:

> From the beginning of this century, Puerto Rico's public policy has revolved around the attitude that the Government has the responsibility of offering direct health services.
>
> Pursuant to such policy, two health systems have evolved which are notably

ment of the corporation, all of which is

unequal. In general terms, we can state that the quality of health care in Puerto Rico has come to depend predominantly on the financial capability of the person to cover the cost thereof with his/her own resources.

Within this scheme, the Department of Health has assumed the care of the medically-indigent sector of our population. *The well-intended efforts of its officials have not been sufficient to counter the adverse effects which factors such as the following have had on the quality of the Department's services: budget insufficiency; increasing costs of technology and medical supplies; bureaucracy and government centralization; and political partisan interference with its efforts.* [Emphasis added.]

Since 1967, there have been several attempts in Puerto Rico to reform medical-hospital services offered by the Department. However, it has not been possible to narrow the ever growing gap between the quality of public and private services.

This history of failing reform is what this case's long history of health care violations parallels.

The remedies fashioned by the court to correct the constitutional violations pertaining to Plaintiffs rights in the area of medical and mental health care have run the gamut from general injunctions, to more specific injunctions, to detailed and itemized plans, to pertinent modifications fine tuning particular portions of those plans, to complementary orders addressed to particular obstacles to the delivery of adequate care to inmates, to, finally, the 1998 *Opinion and Order* which attempts to alter the way mental and medical health services to inmates are delivered, in order to make this delivery more efficient and competitive. All of this in an effort to

spread on the record.

correct what continues to be the unconstitutional manner in which inmates' health care is provided or not provided at all in the AOC. The record of this case demonstrates that pre–1997 efforts to correct current and ongoing constitutional violations in the medical area, have failed. It is, therefore, indisputable that in order to be effective, it is necessary that the relief ordered by this court reach out for new solutions. Instead of the relief proposed by the court's expert in 1997, receivership, this court approved the less intrusive remedy proposed in the joint proposal of 1997 to create the Correctional Health Services Corporation. This was and continues to extend no further than necessary to correct the violation of the Federal right, and is narrowly drawn and constitutes the least intrusive means to correct the violation. *See* 18 U.S.C. § 3626(b)(3).

The best remedy was and remains a nonprofit corporation which when finally operational can work in the new private medical and health services economy. The defendants' evidence shows beyond speculation that right now the CHP depends at a disadvantage on the private sector on everything from lab testing and record storage and retrieval to medical and nursing personnel. Tr. at 552:2–5, 554:8–9, 601:1–24, 680:23–681:22. This is done in an *ad hoc,* helter-skelter way, as the need arises and failure is specifically disastrous—a psychiatrist is missing at the Guerrero facility which is supposed to operate two programs for mental health patients and addicts (La Posada—a psychosocial unit—and intake) and a pharmacist at Zarzal. Tr. at 121:2–14, 240:13–17, 432:20–25, 613:20–614:5, 705:23–24. The Corporation can contract with the Administration of Corrections to provide services and *plan:* at present the Corporation, for example, has developed a telemedicine program to provide psychiatric services at Guerrero to correct for the impoverished availability of mental health personnel in the Western half of Puerto Rico. Tr. at 503:9–12. Thus, the creation of the not-for-profit corporation will lead to the restoration of the AOC's authority under Commonwealth law as the provider of health care to inmates, eliminate the present and intolerable duality in authority, and discharge the Secretary of Health from his court-imposed responsibilities.

The Court has financed through the use of fine funds the development of a modern health care services infrastructure: computerized health records to solve the age old danger of the untransported or lost charts and the treatment disasters that tens of thousands of *expedientillos* or temporary records produced; the system is scheduled to begin in April 2004. Tr. at 670:18–671:1. The Corporation is now at an acute point in the training of personnel to use that system and to abort that development would cause imminent and grievous harm to the plaintiffs by perpetuating a patently unconstitutional denial of their health care.

The only intrusion the Corporation represents is the need to access information and the attendance of personnel at training sessions. The need to remedy constitutional violations which are current and ongoing in undisputable and legally mandated. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). If Federal courts are to exercise the judicial power of the United States, then they must provide a remedy to a plaintiff who complains about and proves violations of his constitutional rights when a case and controversy is properly presented within the court's jurisdiction. The court cannot understand how the work

performed by the Corporation is either overintrussive or overbroad: access to records has worked out so well that there is now a computerized systemwide network due to begin operations as soon as personnel are trained. And the few hours needed to train personnel is an intrusion *de minimis* compared to the health care benefits that will accrue to the plaintiff class. The government has not done it, the Corporation has.

The Corporation is not meant to have an exclusive, perennial right to deliver health care to prisoners. Once organized and structured it will compete in a free market with others. One or two years of Court overseen contracting will prepare the Administration of Corrections—under Commonwealth law the government agency responsible for prison health care—for the task of negotiating with the private sector and making whatever choice is legally available.

The parties were instructed at the beginning of the hearing on these matters that they should limit their evidence to the existence or not of constitutional violations to the members of Plaintiff Class. Tr. at 172:2–9. Defendant wishes, further, to present evidence on the necessary-narrow-least intrusive inquiry. Tr. at 171:10–21. Given the severe time constraints imposed by the PLRA, and the potentially unnecessary delay in the implementation of much needed improvements generated by the CHSC, and the halting of functions already provided by the CHSC, the Court requested that Defendant Rullán make a proffer as to the evidence he wishes to present in this regard. Tr. at 1321:2–13. Based on the proffer made by Defendant Rullán in open Court, the evidence he wishes to present in this regard will add nothing to the inquiry this Court must make in order to resolve defendant Rullán's PLRA motion, it is simply irrelevant.

When first asked to make a proffer, Defendant responded through counsel with a generalized allegation that, "the Corporation is not the least intrusive remedy because they, as of this date have not provided the type of medical services that are being provided by the Correctional Health program" Tr. at 1321:21–24. When doing nothing is "intrusive" was not explained and the assertion was made in bad faith. The Corporation's development is behind schedule but it has already provided computer equipment and established an interinstitutional communication network at the central level, and contributes with the administrative part in purchases, personnel and in accounting and finance and in addition, to medical billing, according to Dr. Mena's testimony. Tr. 502–503. When the court insisted upon the specifics, Defendant stated that he wished to take discovery on the matter. Tr. at 1322:7–15. Why Defendant could not have prepared himself by taking discovery prior to filing the PLRA motion rather than burdening this court's already constrained time to issue a decision on his PLRA motion was not explained.[9] Regardless of whatever need may exist to obtain particularized facts in order to more efficiently present their evidence, the matters Defendant Rullán proposes to conduct discovery on have no bearing on the issues to be decided by this court. Rather, it appears that Defendant Rullán wishes to conduct a smear campaign in an effort to show that the persons operating the CHSC are corrupt or somehow morally reprehensible and/or incompetent and that the CHSC is not ready at present to provide the necessary health care—a point which is not disputed

---

9. The defendant also issued and served trial subpoenas requiring the production, from the Corporation and its board members, a broad spectrum of documents for five or six years.

by any one since the CHSC has not completed its organization.

The presentation of such evidence is unnecessary to the court because it in no way addresses the question of whether the challenged relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." Rather, the evidence Defendant Rullán wishes to present is directed to whether the CHSC is operating as it should in light of state law requirements and the orders of this Court.[10] None of the factual matter specified by Defendant Rullán in his proffer suggest any need for alarm; but if Defendant Rullán has concerns about how the CHSC is being operated, etc., he should feel free to bring those to the Court's attention in order to request that the Court take steps to address those concerns. These facts do not, however, render the relief entered by the Court in 1998 more intrusive, less narrow or less necessary; nor do they implicate any serious need to modify that relief.

On January 14, 2004 a unanimous Supreme Court decided *Frew, et al v. Hawkins,* 540 U.S. ——, 124 S.Ct. 899, —— L.Ed.2d —— (2004).[11] The Court stated the controversy involved thus: "Judicial enforcement of [a] 1996 consent decree is the subject of the present dispute. The decree is a detailed document about 80 pages long that orders a comprehensive plan for implementing the federal statute. In contrast with the brief and general mandate in the statute itself, the consent decree requires the state officials to implement many specific procedures". *Frew,* at

——, 124 S.Ct. at 902. The Court further explained: "To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Ex Parte Young,* [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ]. This standard allows courts to order prospective relief see *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), as well as measures ancillary to appropriate prospective relief, *Green v. Mansour,* 474 U.S. 64, 71–73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) [...]"

The Court then goes on to describe the nature of a consent decree in terms that fit nicely the issues before the court:

Consent decrees have elements of both contracts and judicial decrees. *Local Number 93, Firefighters v. Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405(1986). A consent decree "embodies an agreement of the parties" and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Consent decrees entered in federal court must be directed to protecting federal interests. In *Firefighters,* we observed that a federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and

---

10. Any violation of commonwealth law however unspecific would be a matter for Commonwealth courts and other agencies, not for this Court. And the utter absence of specificity in Defendant's proffer denudes the proffer of any credibility.

11. *Frew* arises under a Medicaid program, Early and Periodic Screening, Diagnosis and Treatment. (ESPDT), Title 42 U.S.C. §§ 1396a(a) 43, 1396d(r).

must further the objectives of the law upon which the complaint was based. 478 U.S., at 525, 106 S.Ct. 3063.

*Frew,* at ——, 124 S.Ct. at 903. This is especially pertinent to the court's decision because the joint proposal, the court's approval in May 1998 and subsequent orders brings this matter within the *Firefighters* doctrine. In *Frew* the Court went on to restate the obvious: "Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." 540 U.S. at ——, 124 S.Ct. at 905.

Finally the Court teaches

When a federal court has entered a consent decree under *Ex parte Young,* the law's primary response to these concerns has its source not in the Eleventh Amendment but in the court's equitable powers and the direction given by the Federal Rules of Civil Procedure. In particular, Rule 60(b)(5) allows a party to move for relief if "it is no longer equitable that the judgment should have prospective application." The Rule encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances. In *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Court explored the application of the Rule to consent decrees involving institutional reform. The Court noted that district courts should apply a "flexible standard" to the modification of consent decrees when a significant change in facts or law warrants their amendment. *Id.,* at 393, 112 S.Ct. 748. See also *Philadelphia Welfare Rights Org. v. Shapp,* 602 F.2d 1114 (C.A.3 1979) (modifying consent decree implementing Pennsylvania's EPSDT program in light of changed circumstances).

*Rufo* rejected the idea that the institutional concerns of government officials were "only marginally relevant" when officials moved to amend a consent decree, and noted that "principles of federalism and simple common sense require the [district] court to give significant weight" to the views of government officials. 502 U.S., at 392, n. 14, 112 S.Ct. 748. When a suit under *Ex parte Young* requires a detailed order to ensure compliance with a decree for prospective relief, and the decree in effect mandates the State, through its named officials, to administer a significant federal program, principles of federalism require that state officials with front-line responsibility for administering the program be given latitude and substantial discretion.

The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials. As public servants, the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities. A State, in the ordinary course, depends upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources. The basic obligations of federal law may remain the same, but the precise manner of their discharge may not. If the State establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree should be enforced according to its terms.

*Frew,* 540 U.S. at —— – ——, 124 S.Ct. at 905–06. The Secretary, however, has not moved for modification but for termination.

The court has no doubt that the moving defendant's own evidence establishes

that the Correctional Health Program is still malfunctioning, that the medical and mental health Plans are not nearly being complied with and that egregious and systematic violations of plaintiffs federal, constitutional rights to health care are being violated. The CHCC is still necessary: the Correctional Health Program of the Department of Health is simply not doing the job. The Administration of Corrections is blamed and the AOC by itself is not prepared to take over the task. The Corporation has been developing systems and can continue to help along the agency charged by Commonwealth law to do the job.

Far from proving Defendant Rullán's case, the evidence presented shows that there currently continue to be ongoing constitutional violations of the rights of Plaintiff Class in the areas of medical and mental health care and that Defendant is not in compliance with the Medical and Mental Health Care Plan. Plaintiffs request that, based on the evidence presented by Defendant, judgment be entered denying Defendant's PLRA Motion under Fed.R.Civ.P. 52(c).

### APPLICABLE LAW

■ The duty of prison authorities to incarcerated inmates is well settled law. The Eighth Amendment prohibits punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles,* 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *Weems v. United States,* 217 U.S. 349, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910), or which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Government officials are therefore required by the Constitution to provide medical care to those who are incarcerated:

An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the commonlaw view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle v. Gamble,* 429 U.S. 97, 103–106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations and footnotes omitted). Thus, it is required that mental, *see Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991) (citations omitted) (there is "[n]o underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." ') and medical health services be provided at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards. *U.S. v. DeCologero,* 821 F.2d 39, 43 (1st Cir.1987). A lack of funds will not excuse

the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment. *Harris v. Thigpen,* 941 F.2d 1495 (11th Cir.1991).

■ A constitutional violation is therefore established when government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health. *Brock v. Wright,* 315 F.3d 158, 162 (2nd Cir.2003); *see also McNally v. Prison Health Servs.,* 28 F.Supp.2d 671, 673–4 (D.Maine 1998) (treatment for HIV). Accordingly, the following have been held to implicate Eighth Amendment rights in the area of mental and medical health care:

a. Neglecting to fully screen incoming inmates or to detect mental health problems. *DeGidio v. Pung,* 920 F.2d 525, 529–33 (8th Cir.1990); *Lareau v. Manson,* 651 F.2d 96, 109 (2nd Cir. 1981); *Inmates of Occoquan v. Barry,* 717 F.Supp. 854 (D.D.C.1989).

b. Failing to provide a sick call system that ensures access to care and that is capable of effectively handling emergencies. *Bass v. Wallenstein,* 769 F.2d 1173 (7th Cir.1985).

c. Failure to take steps to minimize the risk of inmate suicide, *see generally, Partridge v. Two Unknown Police Officers,* 791 F.2d 1182 (5th Cir.1986), and appropriate treatment for suicidal patients, *Comstock v. McCrary,* 273 F.3d 693 (6th Cir.2001).

d. "[I]nterfering with the treatment once prescribed." *Estelle,* 429 U.S at 105, 97 S.Ct. 285. Examples of this form of deliberate indifference are

i. the failure to appropriately administer necessary medication, *Montgomery v. Pinchak,* 294 F.3d 492 (3rd Cir.2002) (HIV); *Wynn v. Southward,* 251 F.3d 588 (7th Cir. 2001) (heart medication); *Roberson v. Bradshaw,* 198 F.3d 645 (8th Cir. 1999) (diabetes);

ii. the failure to provide transportation to scheduled specialty appointments and other therapy, *Kaminsky v. Rosenblum,* 929 F.2d 922 (2nd Cir.1991); *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989); and

iii. The failure to provide prescribed medical diets. *Roberson v. Bradshaw,* 198 F.3d 645 (8th Cir.1999); *Kyle v. Allen,* 732 F.Supp. 1157 (S.D.Fla.1990).

e. Delays in diagnosing and administering appropriate treatment. *Clement v. Gomez,* 298 F.3d 898 (9th Cir. 2002); *H.C. v. Jarrard,* 786 F.2d 1080 (11th Cir.1986)

f. The failure to provide appropriate post surgical care. *Boretti v. Wiscomb,* 930 F.2d 1150 (6th Cir.1991); *Wood v. Sunn,* 865 F.2d 982 (9th Cir. 1988).

g. Cohabitation of severely mentally ill patients with the general population without being tendered any type of mental health treatment, *Cortes–Quinones v. Jimenez Nettleship,* 842 F.2d 556, 560–61 (1st Cir.1988).

h. Failure to provide a sick call system that ensures the needed care. *Bass by Lewis v. Wallenstein,* 769 F.2d 1173 (7th Cir.1985).

i. Failure to provide adequate facilities and equipment. *Langley v. Coughlin,* 888 F.2d 252 (2nd Cir.1989), *Inmates of Allegheny County Jail v. Wecht,* 874 F.2d 147 (3rd Cir.1989).

j. Inadequate record keeping and records management which are critically important to the continuity of medical care, otherwise, the possibility for disaster is created. *Montgomery v.*

*Pinchak,* 294 F.3d 492 (3rd Cir.2002); *Miranda v. Munoz,* 770 F.2d 255 (1st Cir.1985).

■ These and other wrongs of constitutional import have been found by this Court to exist and to constitute violations of the rights of the Plaintiff Class as set out in this Court's *Opinion and Order* of 18 May 1998. *Morales Feliciano v. Rossello Gonzalez,* 13 F.Supp.2d 151, 179 (D.P.R.1998). The historical systemic indifference to inmates' medical and mental health needs and the institutional failures which up to this day continue to threaten the health and the medical safety and well-being of the Plaintiff Class require the continued operation of relief granted in favor of the Class as well as the continued supervision of this Court. *See generally, LaMarca v. Turner,* 995 F.2d 1526 (11th Cir.1993).

Based on the evidence presented by Defendants there can be no doubt that all of the above conditions continue to prevail at AOC. These demonstrate that relief remains necessary to address current and ongoing constitutional violations in the areas of medical and mental health care.

The Medical and Mental Health Plans unequivocally impose a joint responsibility upon both the AOC and the Department of Health for the delivery of health care to the inmates. *See* ¶ 1 of the Medical Plan. The Plans further require interdepartmental cooperation between both agencies to achieve its goals. *See* ¶ 4 of the Medical Plan. By doing so, the Medical and Mental Health Plans adopted the principles of co-operation, trust and teamwork between the medical and correctional components of a prison system that are required under every set of standards, be it the Constitution, ACA or NCCHC, to be able to provide timely and adequate medical services to the inmates. Tr. at 1096–97.

When this restructuring of responsibilities, agreed to and voluntarily undertaken by all parties involved, was initiated, it involved executive and administrative orders issued by state officials under state law to transfer primary healthcare responsibilities to the Secretary of Health. *See* e.g. Ex. D. These orders were issued pursuant to and under the authority of a consent decree. Simply put, under the Constitution and Medical and Mental Health Plans the AOC and the DOH are partners or co-venturers in the delivery of the medical and mental health services to the Plaintiff Class. *Wilson v. Town of Mendon,* 294 F.3d 1, 14–15 (1st Cir.2002) (Joint venture theory succeeds where a defendant " 'associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed.' "); *see also* cases relating t joint liability under § 1983 *Northington v. Marin,* 102 F.3d 1564 (10th Cir.1996); *Weeks v. Chaboudy,* 984 F.2d 185 (6th Cir.1993); *Finch v. City of Vernon,* 877 F.2d 1497 (11th Cir.1989).

Hence, Defendant Rullán's pretension of putting the blame for the serious and pervasive access problems, the sheer inadequacy of the physical facilities and the failure to provide medical diets exclusively on the shoulders of the AOC, fails as a matter of law.

As discussed above, based on the record of this case and on the evidence brought before the Court the relief relating to the CHSC was and continues to extend no further than necessary to correct the violation of the federal right, and is narrowly drawn and constitutes the least intrusive means to correct the violation. 18 U.S.C. § 3626(b)(3).

## PLAINTIFFS' CROSS MOTION

In their opposition to Defendant's Motion the plaintiff class cross-moved to terminate two sections of the Medical Plan assigning the primary responsibility of in-

mates health care to the Department of Health so that responsibility would return to the Administration of Correction, which is the agency designated by Commonwealth law to provide medical, dental and mental health services to the inmate population, 4 LPRA § 1112(f). By returning to the Administration of Corrections the plaintiffs seek to unify responsibility and accountability. At present the Secretary of Health blames the Administrator of Corrections for his flagrant failures and nothing, it seems, can be done to make both agencies work together. The Defendant joins the plaintiffs. Typically the defendants join because, in any case, they will continue the same disastrous present arrangements by interagency agreement as a matter of "public policy".[12] They will of course do so at their peril. The defendants and their counsel have not brought forth any basis for this unknown public policy.

The plaintiffs' request is framed thus:

The scheme set up to place control and responsibility in the DOH has not worked because of conflicting patterns of authority and command lines. For years on end the conflict has survived even when the defendants have called on the Court's authority to help out. The plaintiffs continue to suffer, as shown above, by such inter-departmental conflicts. The plaintiffs must request that the Court terminate Part I(A)(1) and (2) of the Medical Plan. The plaintiffs also move that all orders relating to the Medical Cadre be terminated: these are *Order to Implement Medical Cadre Plan,* Dkt. # 6977; *Order To Assign Correctional Officers to the Medical Ca-*

*dre* (several docket numbers are: 7345; 7417; 7453, and 7574). Other *Orders* referring to budget and transitory matters touching the Medical Cadre are docket numbers 7106; 7418; 7611.

There are a number of orders requested by the parties to dispose of all kinds of problems with administration and execution of the Medical and Mental Health Plans, all of them, usually requested by defendants and plaintiffs, attend transient matters, are now useless and sometimes confusing. They are: *Order that the Chief Correctional Health Care Coordinator Take All Necessary Contractual Steps to Maintain Continuity of Services to Inmates in the Custody of the Administration of Corrections,* (Dkt.# 6558); *Order Regarding Compensation Scale for Correctional Health Employees and Contractors* (Dkt.# 6830); *Order Regarding Purchase of Vehicles for Correctional Health Program* (Dkt.# 6855); *Order stating that Dr. Ernesto Torres Arroyo, MD as Executive Director of the Correctional Health Program shall take all necessary steps to enforce his line of authority, etc.* (Dkt.# 7573); *Endorsed Order of 6/30/97 regarding Joint Motion Stating the Fiscal Arrangements Which Shall Be Made to Pay for the Professional Services Contracted for by the Chief Health Care Coordinator Pursuant to the Court's order of 16 May 1997* (Dkt.# 6567).

## THE MOTION TO INTERVENE

The Union General de Trabajadores, affiliated to the SEIU, Local 1199 on No-

---

**12.** The Supreme Court of Puerto Rico has unequivocally stated that the Commonwealth's public policy is established by the Constitution of Puerto Rico, the statutes enacted thereunder and their judicial interpretation. *Hernandez Torres v. Hernandez Colon,* 129 D.P.R. 824, 878 (1992), citing *Ocasio v. Alcalde,* 121 DPR 37 (1988); *Ortiz Andujar v. ELA;* 122 DPR 817 (1988); *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). The last volume of the Supreme Court's decisions to be published in English is volume 100.

vember 7, 2003 filed a motion to intervene under Rule 24(b) of the Federal Rules of Civil Procedure to join the Secretary's motion, to argue that the privatization of services will put at risk health services and to announce the pendency of two resolutions in the Commonwealth Legislative Assembly and suggesting that it would be prudent to wait until the Senate and House investigations are over before holding hearings (Dkt.# 8523). The court took the motion under advisement and invited counsel to remain; counsel left. The Motion for intervention certainly is not timely, the Union has not specified the commonality of fact or law required by the Rule and has left in the hands of management's lawyers the unions representation. The Union's participation in this case would add nothing but complexity and confusion. The bizarre arrangement whereby the Union's interest are represented by counsel for management is unintelligible.

### *RULE 52 (c)*

Under Rule 52(c), district courts are authorized to enter judgments based on partial findings once a party has presented its evidence with respect to a particular issue:

Judgment on Partial Findings. If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

Fed.R.Civ.P. 52(c). According to Moore's, "A judgment of partial findings may be invoked when: (1) The party pursuing the claim has not demonstrated the elements of the claim either in fact or in law; or (2) the evidence of the party pursuing the claim has established one of the opposing party's defenses as a matter of fact or law." James Wm. Moore et al., Moore's Federal Practice, ¶ 52.50[2] (3d ed 2003). In this case the Rule is properly invoked on both counts: the defendant Secretary has failed to prove his allegations and has established to the satisfaction of even the PLRA, that massive numbers of plaintiffs fail to access and receive health care services for very serious conditions because the systems in place do not work.

Upon the findings and conclusions set out above IT IS SO ORDERED AND ADJUDGED that:

(1) Defendant's *Motion Under the PLRA to Vacate or Terminate the Court Relief Mandating the Transfer and Privatization of the Correctional Health Program of the Department of Health* is denied.

(2) Plaintiffs' Cross Motion is granted. Therefor Part I(A)(I) and (2) of the Medical Plan is terminated, as well as *Order to Implement Medical Cadre Plan,* (Dkt.# 6977) and the various orders to assign officers to the Medical Cadre (Dkt.# 7345); (Dkt.7417); (Dkt.7453); (Dkt.7574); (Dkt.7106); (Dkt.# 7418), and (Dkt.7611). Other orders terminated are: *Order that the Chief Correctional Health Care Coordinator Take All Necessary Contractual Steps to Maintain Continuity of Services to Inmates in the Custody of the Administration of Corrections,* (Dkt.# 6558); *Order Regarding Compensation Scale for Correctional Health Employees and Contractors* (Dkt.# 6830); *Order Regarding Purchase of Vehicles for Correctional Health Program* (Dkt.# 6855); *Order stating that Dr. Ernesto Torres Arroyo, MD as Executive Director of the*

*Correctional Health Program shall take all necessary steps to enforce his line of authority, etc.* (Dkt.# 7573); *Endorsed Order of 6/30/97 regarding Joint Motion Stating the Fiscal Arrangements Which Shall Be Made to Pay for the Professional Services Contracted for by the Chief Health Care Coordinator Pursuant to the Court's order of 16 May 1997* (Dkt.# 6567).

(3) The Unión de Trabajadores Motion To Intervene is denied.

IT IS FURTHER ORDERED that the Secretary of Corrections and the plaintiff class shall meet and file with the Court within forty-five (45) days of the entry of this order a plan on how the Administrator of Corrections will assume his legal responsibility to provide health care to inmates.